UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STRONGBOW HOLDINGS, LLC,

                Plaintiff,

         v.

RMS TITANIC, INC.,

                Defendant.

RMS TITANIC, INC.,

                Plaintiff,

         v.

MOBILE GROCERS OF AMERICA, LLC,
STRONGBOW HOLDINGS, LLC, MAUREEN
DALEY, JOHN DOES 1-5, JANE DOES 1-5, *and*
ABC CORP.,

                Defendants.

**OPINION AND ORDER**

22-cv-5680 (ER)

22-cv-5685 (ER)

Ramos, D.J.:

      These related cases pertain to the ownership of four artifacts recovered from the wreckage of the historic luxury passenger liner R.M.S. Titanic (the "Titanic"). To resolve its claim of ownership, RMS Titanic, Inc. ("RMST") originally brought an action against Strongbow Holdings, LLC ("Strongbow") in New York County Supreme Court on July 3, 2022. Two days after it was filed, Strongbow brought another action in this Court, Case No. 22-cv-5680 (the "Strongbow action"), against RMST to resolve its claim of ownership over the same four items and simultaneously removed the state action filed by RMST, Case No. 22-cv-5685 (the "RMST action") to this Court.

Now before this Court are (1) RMST's motion to remand the RMST action to state court for lack of diversity jurisdiction; (2) RMST's motion to dismiss the Strongbow action pursuant to the first-filed rule, or in the alternative, to stay the Strongbow action pending the adjudication of the state court action; and (3) Strongbow's claim for disciplinary sanctions pursuant to 28 U.S.C. § 1927.[1]

For the reasons set forth below, the motions are DENIED.

## I.   BACKGROUND

This case concerns four artifacts recovered from the Titanic, which tragically sank in the North Atlantic Ocean on April 14–15, 1912 during her maiden voyage.  Compl., Doc. 1 ¶¶ 1, 15. After the wreckage of the Titanic was found, thousands of artifacts were recovered over the course of seven expeditions that took place between 1987 and 2004.[2]  Id. ¶¶ 17–18.  The four artifacts in dispute here are:  one 1912 gold coin and two $5 bills recovered in the 1987 expedition, and one piece of coal recovered in the 1994 expedition (collectively the "Four Items").  Id. ¶¶ 1, 21.

### A.  Ownership of the Four Items

The first expedition to the Titanic in 1987 was a joint expedition.  Id. ¶ 17.  It was led by filmmaker and explorer, D. Michael Harris, through his company Titanic Ventures Limited Partnership ("TVLP") in partnership with a French firm by the name of the Institut français de recherche pour l'exploitation de la mer ("IFREMER").  Id. ¶ 16; R.M.S. Titanic, Inc. v. Wrecked

---

[1] The Court instructed both parties to brief their motion in one set of papers.  The Court will thus refer to documents filed in the Strongbow action, No. 22-cv-5680, unless otherwise indicated.

[2] In the 1980s, a search for the Titanic commenced, and the wreckage was found in 1985.  Compl. ¶ 16.  In a 1987 expedition, approximately 1,800 artifacts were recovered, and over 5,000 additional artifacts were recovered over six subsequent expeditions.  Id. ¶¶ 17–18.  One expedition was conducted in each of the years 1987, 1993, 1994, 1996, 1998, 2000, and 2004.  Id.

& *Abandoned Vessel*, 742 F. Supp. 2d 784, 788 (E.D. Va. 2010) ("Titanic 2010"). All artifacts from this expedition were brought to France, and titled to France. Ex. 1 to Segal Decl., Doc. 28-1 at 5, ¶ 18. But in 1993, France awarded title to TVLP for all the artifacts which had not been claimed.[3] Ex. 3 to Segal Decl., Doc. 28-3. Then that same year, all of TVLP's assets and liabilities, including its interests in the Titanic wreckage, were acquired by RMST when it filed an action with the United States District Court for the Eastern District of Virginia ("Virginia federal action"), requesting that the court award it exclusive salvage rights over the Titanic. Compl. ¶¶ 20, 23. Approximately one year later, in June 1994, the court conferred exclusive "salvor-in-possession" status to RMST.[4] *Id.* ¶ 24; *see also R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 920 F. Supp. 96, 97 n.1 (E.D. Va. 1996) (citing the court's 1994 order conferring salvor-in-possession status to RMST).

After its final expedition to the wreck site in 2004, RMST moved for a salvage award in the Virginia federal action, requesting full, unencumbered title to all of the artifacts it recovered. Compl. ¶ 26. The court denied RMST's motion for full title to the recovered artifacts at that stage of the proceedings,[5] and the Fourth Circuit affirmed. *See R.M.S. Titanic, Inc. v. Wrecked &*

---

[3] According to a translated letter from the Office of Maritime Affairs for France, the items not claimed were delivered to TVLP in accordance with Article 12 of Decree No. 61-1547, dated December 26, 1961. *See* Ex. 3 to Segal Decl., Doc. 28-3 at 8. The letter further states that "[TVLP] agreed to make use of such objects in conformity with the respect due to the memory of their initial owners and to not carry out any commercial transaction concerning such objects nor any sale of any one of them nor any transaction entailing their dispersion, if not for the purpose of an exhibition." *Id.* at 9.

[4] By being granted "salvor-in-possession" status, RMST was given a lien on the property being recovered during its expeditions to the Titanic wreck site. Compl. ¶ 24; *see also R.M.S. Titanic, Inc. v. The Wrecked & Abandoned Vessel*, 435 F.3d 521, 531 (4th Cir. 2006) ("To secure payment of the salvage award, the law gives salvors a maritime lien on the salved property.") (citation omitted).

[5] The Virginia district court determined that it had no authority to award title until (1) the amount of the salvage lien was determined, (2) the value of the artifacts was determined, and (3) it reached the conclusion that sale of the artifacts would produce less than the outstanding amount of the salvage lien. *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 323 F. Supp. 2d 724, 737 (E.D. Va. 2004), *aff'd in part, vacated in part, remanded sub nom. R.M.S. Titanic, Inc. v. The Wrecked & Abandoned Vessel*, 435 F.3d 521 (4th Cir. 2006). This determination was

*Abandoned Vessel*, 323 F. Supp. 2d 724, 744–45 (E.D. Va. 2004), *aff'd in part, vacated in part,*
*remanded sub nom. R.M.S. Titanic, Inc. v. The Wrecked & Abandoned Vessel*, 435 F.3d 521, 524
(4th Cir. 2006) ("[W]e vacate the district court's order in this case to the extent that it seeks to
exercise *in rem* jurisdiction over the 1987 artifacts or declare a right of title in them.  We affirm
the district court's order denying RMST's request to seek to change its role from that of salvor-
in-possession to that of a finder.").

In 2007, RMST moved again for a salvage award with the Virginia district court, along
with several volumes of exhibits, seeking a salvage award for its efforts salvaging the Titanic
through December 31, 2006.[6]  *See Titanic 2010*, 742 F. Supp. at 791–92.  Upon request, the court
granted the United States leave to submit its views on the motion and subsequently granted an
extension of time which pushed the motion to 2008.  *Id.* at 792.  From 2008 to 2009, RMST and
the United States deliberated on proposed covenants and conditions for a potential salvage
award.  *Id.* at 793.

---

based on the application of salvage law.  *See, e.g.*, *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 286 F.3d
194, 204–05 (4th Cir. 2002) ("[U]nder salvage law, the salvor receives a lien in the property, not title to the property,
and as long as the case remains a salvage case, the lienholder cannot assert a right to title.") (citation omitted);
*Fairport Int'l Expl., Inc. v. Shipwrecked Vessel, Captain Lawrence*, 177 F.3d 491, 498 (6th Cir. 1999) ("The law of
salvage applies when the original owner retains an ownership interest in the ship; a salvor receives a salvage award,
but not title to the ship."); *Ne. Rsch., LLC v. One Shipwrecked Vessel*, 729 F.3d 197, 208 (2d Cir. 2013)
("The law of salvage generally governs efforts to save vessels in distress.  Under the law of salvage, rescuers take
possession of, but not title to, the distressed vessel and its contents.") (citing *Int'l Aircraft Recovery, L.L.C. v.
Unidentified, Wrecked & Abandoned Aircraft*, 218 F.3d 1255, 1258 (11th Cir. 2000)).

[6] On October 1, 2007, the district court and parties convened "in order to (1) receive an updated report from the
United States regarding the status of legislation proposed by the Department of State to implement an international
agreement between the United States, the United Kingdom, Canada, and France, which will lead to the increased
protection of the [Titanic] and its wreck site; and (2) set forth the parameters and deadline for [RMST] to pursue a
salvage award."  *R.M.S. Titanic, Inc. v. The Wrecked & Abandoned Vessel*, 531 F. Supp. 2d 691, 691–92 (E.D. Va.
2007).

On August 12, 2010, RMST was finally granted a salvage award in the Virginia federal action, but the court reserved the right to determine the manner in which to pay the award.[7] *See Titanic 2010*, 742 F. Supp. at 809.  A year later, when no buyer with an interest in purchasing the artifacts came forward, the court granted RMST title to all artifacts except for the those recovered during the 1987 expedition.[8] *See* Compl. ¶ 29; *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel, Its Engines, Tackle, Apparel, Appurtenances, Cargo, Etc.*, 804 F. Supp. 2d 508, 509 (E.D. Va. 2011).  As a critical component of its salvage rights, the court directed RMST to serve as the steward and custodian of the wreck to protect and preserve the site and its artifacts.  Ex. 1 to Segal Decl., Doc. 28-1 at 6 ¶ 21; *see also Titanic 2010*, 742 F. Supp. 2d at 788.  This required that RMST comply with certain conditions.  Ex. 1 to Segal Decl., Doc. 28-1 at 6 ¶ 22.  For example, RMST had a duty to notify the court whenever it learned of actions that could violate its salvage rights or any of the court's prior orders, and the collection of post-1987 artifacts had to be kept together.  *Id.* ¶¶ 21–22.  Additionally, the only portion of the collection that could be sold commercially were the lumps of coal that were recovered.  *See id.* ¶ 22; *see also R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 742 F. Supp. 2d 784, 811 (E.D. Va. 2010) ("[T]he Subject TITANIC Artifact Collection does not include [] lumps of coal recovered from The RMS TITANIC wreck site . . . .").

### i.  The First Transfer

Strongbow alleges that the first transfer of the Four Items took place on August 15, 1997, when then-president of RMST, George Tulloch, gifted them to G. Michael Harris ("G.M.

---

[7] The Virginia federal action awarded RMST a salvage award equal to 100% of the fair market value of the artifacts recovered in the six expeditions undertaken in 1993, 1994, 1996, 1998, 2000, and 2004.  Compl. ¶¶ 28, 18.

[8] The court granted RMST an *in specie* salvage award which gave it title to "specifically those [artifacts] recovered in the 1993, 1994, 1996, 1998, 2000, and 2004 salvage expeditions."  *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel, Its Engines, Tackle, Apparel, Appurtenances, Cargo, Etc.*, 804 F. Supp. 2d 508, 509 (E.D. Va. 2011).

Harris"), an RMST shareholder and the son of D. Michael Harris, the leader of the first expedition.[9]  *See* Ex. 5 to Segal Decl., Doc. 28-5 at 13.  In a letter addressed to G.M. Harris, Tulloch wrote, "[t]o be completely clear, from this point forward[,] [RMST], TVLP & [Oceanic Research & Exploration Limited] have no claim of ownership to the above artifacts nor have these artifacts ever been a part of the Federal Courts in Norfolk, Virginia."  *Id.*  RMST calls into question the authenticity of the letter.[10]  *See* Memo. in Supp., Doc. 29 at 7.

### ii.  The Transfer to Packwood Investments, LLC

At some time in July 2014, Strongbow alleges that G.M. Harris borrowed $25,000 from a friend, Douglas Prescott, and pledged the Four Items as collateral.  Compl. ¶ 31.  Approximately two years later, in 2016, G.M. Harris borrowed $2 million from Packwood Investments, LLC ("Packwood"), and again pledged the same Four Items as collateral.  Case No. 22-cv-5685, Daly Decl., Doc. 12 ¶ 2; *see also* Compl. ¶ 32.  Maureen Daly is the sole member of Packwood.  *See* Case No. 22-cv-5685, Daly Decl., Doc. 12 ¶ 2.

In July 2017, Packwood filed a UCC-1 financing statement indicating that it held a lien on the Four Items.  Compl. ¶ 32.  However, RMST alleges that it did not have knowledge of the transfers until January 2018, when Brian Wainger—long-time Virginia counsel for RMST— received a call from an attorney representing Maureen Daly and her entity, Packwood.  Segal Decl., Doc. 28 ¶ 10.  During this call, counsel for Daly and Packwood advised that G.M. Harris had pledged the Four Items as collateral in connection with a $2 million loan and that they

---

[9] This alleged transfer would have occurred after RMST was granted "salvor-in-possession" status, but before title to the artifacts was determined.  *See generally* Compl. ¶¶ 24–27.

[10] According to RMST, "[G.M. Harris] and Tulloch did not see eye-to-eye."  Ex. 1 to Segal Decl., Doc. 28-1 ¶ 24.  Therefore, it questions the authenticity of the letter, attached as Exhibit 5 to the Segal Declaration, which is addressed to "G. Michael Harris (Mikey)."  See Ex. 5 to Segal Decl., Doc. 28-5.  RMST claims that to its knowledge, Tulloch never publicly referred to G.M. Harris as "Mikey."  Ex. 1 to Segal Decl., Doc. 28-1 ¶ 27.

intended to foreclose on the Items. *Id.* Wainger advised Packwood's counsel that RMST did not believe G.M. Harris was the lawful owner of the Four Items, and further underscored that RMST disputed Packwood's ability to foreclose on the Items. *Id.* ¶ 11.

On February 20, 2018, Wainger followed up in writing, advising that RMST contested the claims of ownership and lawful possession by G.M. Harris, and objected to any attempt to repossess or sell the Four Items. Ex. 5 to Segal Decl., Doc. 28-5 at 17. Moreover, in compliance with its obligations pursuant to the Virginia federal action, RMST notified the court of Packwood's alleged lien on April 5, 2018. Segal Decl., Doc. 28 ¶ 12. Nevertheless, it is alleged that Packwood did not attempt to foreclose on its lien, and thus, there was no further action taken on behalf of RMST. *Id.* at ¶ 13. RMST also underscores that Daly, as an officer of Packwood, has had knowledge of RMST's claim of ownership over the Four Items since at least January 2018. Ex. 1 to Segal Decl., Doc. 28-1 ¶ 33.

### iii.  The Sale to Mobile Grocers of America, LLC

In September 2019, G.M. Harris could not repay his debts and filed a voluntary petition under Chapter 7 of the Bankruptcy Code in the Middle District of Florida, therein listing the Four Items as part of his assets. *See* Compl. ¶ 37; Ex. 1 to Segal Decl., Doc. 28-1 at 8 ¶ 34; Ex. 8 to Segal Decl., Doc 28-8. The Four Items were sold during a bankruptcy sale on December 29, 2021 by the bankruptcy trustee to Daly, Compl. ¶ 38, through a separate entity called Mobile Grocers of America, LLC ("Mobile Grocers"), for $45,000. Suppl. Daly Decl., Doc. 31 ¶ 3. According to the "Report and Notice of Intention to Sell Property of the Estate 'As Is, Where Is,'" the Items were sold "'As Is, Where Is' with no warranties of any kind," and the Notice of Sale expressly provided that it was the "buyer's responsibility to examine title." Ex. 8 to Segal

Decl. Doc 28-8.  RMST contends that it was not listed as a creditor in the bankruptcy, and that it had no notice of the sale.  Memo. in Supp., Doc. 29 at 6.

### B.  The Auction & Transfer to Strongbow

After the purchase, Daly planned to auction the Four Items through Guernsey's Auction House ("Guernsey's") in New York City.  Suppl. Daly Decl., Doc. 31 ¶ 4.  But because the auction would not take place for several months and Daly did not want to wait, she asked Guernsey's President for help "monetizing her interests sooner."  *Id.*  At or around that time, Guernsey's President introduced Daly to Strongbow.  *Id.*  While the auction was pending, Strongbow advanced funds to Daly with the understanding that it would be repaid from the proceeds of the sale.  *Id.*  The auction of the Four Items was scheduled to take place in June 2022.  Compl. ¶ 42.

A little over one month before the auction, on April 29, 2022, an attorney for RMST called Guernsey's President to assert RMST's claim to the Four Items.  Compl. ¶ 43.  In response, Daly and her business partner began making numerous calls to RMST's CEO, Jessica Sanders, and other RMST officials, asking RMST to retract its claim of ownership.  Suppl. Daly Decl., Doc. 31 ¶ 6.  However, when none of Daly's calls or emails were returned, she decided to sell the Four Items to Strongbow.[11]  *Id.* ¶¶ 6–8.  After the sale, Strongbow asked Daly to drive the Four Items to New York from Florida, and she did, delivering the Items to Guernsey's so that Strongbow could auction them.  Case No. 22-cv-05685, Daly Decl., Doc. 12 ¶ 8; Suppl. Daly Decl., Doc. 31 ¶ 9.

---

[11] Daly states, "[w]hen it became clear that the auction was not going to occur anytime soon, Strongbow offered to buy me out completely, with a cash payment that, in my view, was well below the fair market value.  I nevertheless agreed to sell because, as I explained in my earlier declaration, I do not have the financial resources to pay for lawyers over years of litigation with RMST."  Suppl. Daly Decl., Doc. 31 ¶ 8; *see also* Case No. 22-cv-5685, Daly Decl., Doc. 12 ¶ 10 ("[O]ne reason I sold the items was that I did not want to have to hire lawyers to take on RMST, which has vastly more resources than I do.").

RMST's current counsel, David F. Segal, called Guernsey's President to inquire about the status of the auction on June 8, 2022, and was advised that the auction was suspended.  Segal Decl., Doc. 28 ¶ 18.

### C.  The Parties' Communications Leading to Litigation

Several days after the suspension of the auction, on June 17, 2022, Daly left a voicemail for Segal, RMST's counsel, to discuss the Four Items.  *See* Ex. 10 to Segal Decl., Doc 28-10.  RMST then scheduled a call for June 21, 2022, but it did not occur until two days later, June 23, when Daly directed RMST to call Charles Michael, Strongbow's counsel.  Segal Decl., Doc. 28 ¶¶ 22, 26.  RMST alleges that it was not advised that Daly was no longer the owner of the Four Items during that call.  *Id.* ¶ 26.  Instead, it received notice the next day, on June 24, 2022, that Strongbow now claimed ownership over the Four Items.  Ex. 11 to Segal Decl., Doc 28-11.  At the time, RMST alleges that it believed Daly had simply transferred the Four Items to another one of her affiliated entities.[12]  Segal Decl., Doc. 28 ¶ 27.  Thus, RMST argues that it believed Daly still had an interest in the Four Items.  Memo. in Supp., Doc. 29 at 7.

RMST's counsel, Segal, emailed Strongbow's counsel, Michael, on June 30, 2022 to advise that it would have a response the following week.  Ex. 12 to Segal Decl., Doc. 28-12.  In response, Michael requested a call, but Segal did not get back to him until that evening at 5:20 p.m.  Segal Decl., Doc. 28 ¶ 29.  Segal informed Michael that he had stopped working and would likely not be working the following day, Friday, July 1, due to a family commitment.  *Id.*

---

[12] RMST points to a chain of events that led it to believe Strongbow was just another one of Daly's companies.  First, both of Daly's entities—Packwood and Mobile Grocers—have asserted ownership over the Four Items since 2018.  Case No. 22-cv-5685 Compl., Doc. 1-1 ¶ 29; Case No. 22-cv-5685 Answer, Doc. 10 ¶ 36.  Second, from May to June 2022, it was Daly who made numerous calls to RMST to discuss the Four Items.  Suppl. Daly Decl., Doc. 31 ¶ 6.  Third, it was Daly who consigned the Items to Guernsey's which again prompted the dispute over ownership.  *See id.* ¶¶ 4–6  Lastly, on June 21, 2022, it was Daly who referred RMST to Strongbow's counsel.  *Id.* ¶ 9.  Accordingly, RMST contends, it believed that Daly created Strongbow to transfer the Four Items.  Segal Decl., Doc. 28 ¶ 27.

Accordingly, he offered to call Michael on the next business day after the July 4 holiday weekend, Tuesday, July 5, and both parties agreed. *Id.* However, while the parties agreed to speak on July 5, Segal claims Michael stated he "[could not] make any promises" on holding off pursuing litigation, and Segal states he did not ask him to do so. *Id.*

Strongbow claims to have had its complaint drafted and ready to file by Friday, July 1, 2022. Opp'n, Doc. 30 at 12. However, it held off on the filing because RMST's counsel had represented that he was not working that day and agreed to speak on Tuesday, July 5. *Id.* At some point on July 1, Segal claims his family commitment "fell through," and he began revising a complaint he had previously begun drafting. Segal Decl., Doc. 28 ¶ 30–31. Then on Sunday, July 3, 2022, at the direction of RMST, Segal filed an action in New York County Supreme Court seeking a declaratory judgment and an injunction. *Id.* ¶ 32. In his declaration in support of the instant motions, RMST's counsel acknowledges the "optics" of the timing and concedes to proceeding with its filing as directed by his client. *Id.* ¶ 32 n.3 ("We were quite aware of the 'optics' regarding the timing of receiving approval, authorization and direction to file the Complaint, and the call with counsel scheduled for the following Tuesday. Nevertheless, the Complaint was filed as directed.").[13]

On July 20, 2022, RMST and Strongbow entered into a confidentiality agreement to exchange a copy of Strongbow's sale agreement with Daly. Segal Decl., Doc. 28 at 10 n.4. On August 31, 2022, Strongbow provided a copy of the sale agreement to RMST, however, Strongbow's address and the individual who signed on behalf of Strongbow were redacted. *Id.*

---

[13] Presumably, by "optics," Segal is referring to the fact that RMST filed its complaint on a Sunday in the middle of the July 4 holiday weekend despite his informal agreement with Strongbow's counsel to continue their talks on July 5.

### D.  Procedural History

RMST filed a complaint in the New York County Supreme Court against Strongbow, Mobile Grocers, and Maureen Daly on July 3, 2022.  Case No. 22-cv-5685 Doc. 1-1.  On July 5, 2022, Strongbow removed the RMST action to this Court premised on diversity of citizenship, Case No. 22-cv-5685 Doc. 1, and the related Strongbow action was filed on the same day, Case No. 22-cv-5680 Doc. 1.

On August 12, 2022, the Court held a pre-motion conference as to both related matters, authorizing the parties to file the pending motions in one set of briefs.  Conference Tr., Doc. 32-3 at 16, Aug. 12, 2022.

On September 7, 2022, RMST moved to remand the RMST action back to state court, and to dismiss the Strongbow action.  Doc. 27.  Strongbow opposed the motion and filed a cross-motion for sanctions.  Doc. 30.  The motions were fully briefed on September 30, 2022.  *See* Doc. 33.

## II.    DISCUSSION

### A.  RMST's Motion to Remand the RMST Action

RMST moves to remand the RMST action to state court on the ground that this Court lacks subject matter jurisdiction.  Memo. in Supp., Doc. 29 at 11.  It asserts that complete diversity does not exist because defendants Daly and Mobile Grocers are both Florida residents, as is RMST.[14]  *Id.*

---

[14] RMST never asserts that diversity is otherwise deficient as between itself and Strongbow.  *See* Memo. in Supp., Doc. 29 at 11.  RMST concedes it is a citizen of Florida for the purposes of this jurisdictional inquiry.  *See id.* ("Daly and Mobile Grocers are both Florida residents, *as is RMST*.") (emphasis added).  And despite Strongbow admitting to having an address in Delaware, Case No. 22-cv-5685 Answer, Doc. 10 ¶ 11, it claims to be a citizen of New York because "its sole member is a trust" and "the trustee and beneficiaries of the trust are New York citizens," Compl. ¶ 11.  For purposes of determining diversity jurisdiction, a limited liability company "takes the citizenship of each of its members."  *Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 49 (2d Cir. 2012).

Strongbow argues that there is complete diversity between the parties; indeed, it contends that the Court must disregard the citizenship of Daly and Mobile Grocers under the doctrine of fraudulent joinder.  Opp'n, Doc. 30 at 19.  RMST maintains Daly and Mobile Grocers have not been fraudulently joined because both are integral and proper defendants to the dispute.  Reply, Doc. 33 at 9–10.

### i. Legal Standard

The federal removal statute provides that "any civil action brought in a state court of which the district courts of the United States have original jurisdiction[] may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."  28 U.S.C. § 1441(a).  The Second Circuit has established that "in light of the congressional intent to restrict federal court jurisdiction, as well as the importance of preserving the independence of state governments, federal courts construe the removal statute narrowly, resolving any doubts against removability."  *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 213 (2d Cir. 2013) (quoting *Lupo v. Human Affairs Int'l, Inc.*, 28 F.3d 269, 274 (2d Cir. 1994)).  The party seeking removal bears the burden of proving that the jurisdictional and procedural requirements of removal have been met. *Mehlenbacher v. Akzo Novel Salt, Inc.*, 216 F.3d 291, 296 (2d Cir. 2000).  However, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."  28 U.S.C. § 1447(c).

"Where removal is based on diversity jurisdiction, there must be complete diversity of citizenship between the plaintiff(s) and the defendant(s)."  *Sons of the Revolution in N.Y., Inc. v. Travelers Indem. Co. of Am.*, No. 14 Civ. 03303 (LGS), 2014 WL 7004033, at *2 (S.D.N.Y. Dec. 11, 2014).  The party seeking to invoke diversity jurisdiction bears the burden of

demonstrating that diversity is complete. *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936).

Nevertheless, "a plaintiff may not defeat a federal court's diversity jurisdiction and a defendant's right of removal by merely joining[,] as defendants[,] parties with no real connection with the controversy." *Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 460–61 (2d Cir. 1998). Indeed:

> In order to show that naming a non-diverse defendant is a "fraudulent joinder" effected to defeat diversity, the defendant must demonstrate, by clear and convincing evidence, either that there has been outright fraud committed in the plaintiff's pleadings, or *that there is no possibility, based on the pleadings, that a plaintiff can state a cause of action against the non-diverse defendant in state court.*

*Id.* at 461 (emphasis added).

A defendant alleging fraudulent joinder "bears the heavy burden of proving this circumstance by clear and convincing evidence, with all factual and legal ambiguities resolved in favor of plaintiff." *Briarpatch Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 302 (2d Cir. 2004). "Courts examining a complaint to determine whether a party has been 'fraudulently' joined will subject the complaint 'to less searching scrutiny than on a motion to dismiss for failure to state a claim.'" *Almeciga v. Ctr. for Investigative Reporting, Inc.*, 121 F. Supp. 3d 379, 382 (S.D.N.Y. 2015) (quoting *Intershoe, Inc. v. Filanto S.P.A.*, 97 F. Supp. 2d 471, 474 (S.D.N.Y. 2000)).

When considering a motion to remand, the district court accepts as true all relevant allegations contained in the complaint and construes all factual ambiguities in favor of the plaintiff. *See Weiss v. Hager*, No. 11 Civ. 2740 (VB), 2011 WL 6425542, at *2 (S.D.N.Y. Dec. 19, 2011). Moreover, "[b]ecause this is a jurisdictional inquiry," the Court may "look beyond the face of the complaint" to affidavits and exhibits when deciding whether to remand. *Gov't*

*Emps. Ins. Co. v. Saco*, No. 15 Civ. 634 (NGG) (MDG), 2015 WL 4656512, at *3 (E.D.N.Y. Aug. 5, 2015).

### ii.  Application

Here, RMST argues that removal is improper because "complete diversity does not exist *if* Daly and Mobile Grocers are properly joined as parties."  Memo. in Supp., Doc. 29 at 11 (emphasis added).  Thus, the question before this Court is whether defendants Daly and Mobile Grocers were properly joined.

To show that a non-diverse defendant was fraudulently joined, "the defendant must demonstrate, by clear and convincing evidence, . . . that there is no possibility, based on the pleadings, that a plaintiff can state a cause of action against the non-diverse defendant in state court."  *Pampillonia*, 138 F.3d at 461.  Thus, the Court must determine whether there is any possibility that RMST's claims against Daly and Mobile Grocers could survive.  *See Kuperstein v. Hoffman-Laroche, Inc.*, 457 F. Supp. 2d 467, 470 (S.D.N.Y. 2006) ("If even one of the plaintiff's claims against a non-diverse defendant can survive, the action must be remanded.").

In this case, Strongbow has presented evidence in the form of two declarations by Daly to show that there is no reasonable basis to include Daly and Mobile Grocers as defendants.  *See* Case No. 22-cv-05685, Daly Decl., Doc. 12.  In her declarations, Daly asserts that she is the sole owner of Mobile Grocers, *id.* ¶ 1; Daly, through Mobile Grocers, sold the Four Items to Strongbow, *id.* ¶ 3; Daly is not an officer, employee, or owner of Strongbow, *id.* ¶ 4; neither Daly nor Mobile Grocers claim ownership rights over the Four Items, *id.* ¶ 4; and neither has the Four Items in its possession, *id.* ¶ 8.[15]  Therefore, neither is a relevant party to the controversy.

---

[15] While RMST contends that Daly's Declaration dated July 26, 2022 is self-serving, courts can look beyond the pleadings.  *See, e.g.*, *Pampillonia*, 138 F.3d at 461–62 (finding an affidavit submitted by Defendant supported a

RMST nonetheless insists that "[t]he mere fact that [it] seeks a declaratory judgment . . . and that Defendants have no legal rights or interests therein, does not mean that there is no possibility to state a claim against Daly or Mobile Grocers." Memo. in Supp., Doc. 29 at 13. However, this assertion is misguided. Fraudulent joinder is warranted "where there is *'no possibility'* of *recovery*." *Nemazee v. Premier, Inc.*, 232 F. Supp. 2d 172, 178 (S.D.N.Y. 2002) (emphasis added).

Here, RMST seeks a declaratory judgment and preliminary injunction.[16] Case No. 22-cv-5685 Compl., Doc. 1-1 at 8–10. In state court, "[a] cause of action for declaratory relief accrues when there is a bona fide, justiciable controversy between the parties." *Zwarycz v. Marnia Const., Inc.*, 958 N.Y.S.2d 440, 442 (N.Y. App. Div. 2013). "To constitute a 'justiciable controversy,' there must be a real dispute between adverse parties, involving substantial legal interests for which a declaration of rights will have some practical effect."[17] *Hernandez v. State*, 173 A.D.3d 105, 109–10 (N.Y. App. Div. 2019) (citations omitted); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) ("[T]he question . . . is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.") (citation omitted). "A controversy is said to exist where the plaintiff

---

finding of fraudulent joinder); *Land v. Dollar*, 330 U.S. 731, 735 (1947) ("[A]s a general rule the District Court would have authority to consider questions of jurisdiction on the basis of affidavits as well as the pleadings.").

[16] An injunction is not a cause of action, it is a remedy. *See Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 407 (S.D.N.Y. 2010) ("Injunction is not a separate cause of action; it is a remedy."); *Residential Bd. of Managers of the Columbia Condo. v. Alden*, 576 N.Y.S.2d 859, 861 (N.Y. App. Div. 1991) ("A preliminary injunction is a provisional remedy."). Since an injunction is not a cause of action, the Court will not consider it for the purposes of this jurisdictional inquiry.

[17] "The general purpose of the declaratory judgment is to serve some *practical end in quieting* or stabilizing *an uncertain or disputed jural relation* either as to present or prospective obligations." *Thome v. Alexander & Louisa Calder Found.*, 70 A.D.3d 88, 99 (N.Y. App. Div. 2009) (emphasis added).

asserts rights which are actually challenged by the defendant." *Chanos v. MADAC, LLC*, 903 N.Y.S.2d 506, 508 (N.Y. App. Div. 2010).

Here, there is no justiciable controversy as to Daly or Mobile Grocers for which a declaration of rights will have any practical effect.  First, both Daly and Mobile Grocers admit to no longer having any "legal rights or interest" in the Four Items.  Case No. 22-cv-5685, Daly Decl., Doc. 12 ¶ 4.  Secondly, both Daly and Mobile Grocers admit to no longer being in possession of the Four Items.  *Id.* ¶ 8.  Despite these facts, RMST reasons that both entities are integral because at some point they asserted ownership over the Four Items.[18]  Memo. in Supp., Doc. 29 at 11–12.  However, Daly has unambiguously declared that the Items have been sold and that neither she nor Mobile Grocers has any continuing interest in the Items.  *See* Case No. 22-cv-5685, Daly Decl., Doc. 12 ¶ 7.

Ultimately, RMST seeks a judicial declaration that "*Defendants have no legal rights or interests* [to the Four Items]."  Case No. 22-cv-5685 Compl., Doc. 1-1 ¶ 56 (emphasis added).  Such judicial declaration is unnecessary because as Daly has unambiguously declared, "[h]aving sold the four items to Strongbow, [she] no longer claim[s] any ownership rights whatsoever.  Nor does Mobile Grocers."  Case No. 22-cv-5685, Daly Decl., Doc. 12 ¶ 4.  Furthermore, she states "I fully agree that neither me nor Mobile Grocers have 'legal rights or interest' in the four items . . . .  As for whether 'RMST is the lawful owner of the Artifacts,' that is a matter between

---

[18] Strongbow correctly points out that, "[i]t is certainly true that Ms. Daly is involved in the fact pattern, but not every party involved in the facts is a proper defendant . . . . Simply put, RMST is refusing to take 'yes' for an answer, and stubbornly continuing to sue Ms. Daly and Mobile Grocers for no good reason."  Opp'n, Doc. 30 at 21–22.

RMST and Strongbow, the only two parties of which I am aware that are claiming to be the lawful owners." *Id.* ¶ 7.

There is currently no indication that Daly or Mobile Grocers presently maintains rights over the Four Items nor is there evidence that they seek to do so.  Thus, while RMST still believes both are integral defendants because it *suspects* they still maintain interests in the Items, that suspicion does not overcome the information before the Court.[19]  Accordingly, RMST's allegations fail to identify any present controversy or disputed legal relationship against Daly and Mobile Grocers that would be resolved by a declaratory judgment against them in light of Daly's declaration.  Therefore, the Court concludes neither Daly nor Mobile Grocers is an indispensable party to the matter, and thus dismisses them under Federal Rule of Civil Procedure 21.[20]

For the purposes of removal, the Court concludes diversity jurisdiction exists between the relevant parties and removal was proper.  Accordingly, RMST's motion to remand is denied.

### B.  RMST's Motion to Dismiss the Strongbow Action

Next, RMST argues that the Strongbow action should be dismissed pursuant to the first-filed rule on the grounds that (1) it filed its state court suit first, (2) the Strongbow action was a retaliatory filing, (3) the Strongbow action and the RMST action seek a declaration as to ownership of the same Four Items, and (4) it would be prejudiced by federal litigation because it cannot bring its claims against the non-diverse parties.  Memo. in Supp., Doc. 29 at 15.

---

[19] If information arises through the course of litigation that would disrupt diversity, the case can be remanded.  *See* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.").

[20] "[I]t is well settled that Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time."  *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 832 (1989); *see also* Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party.").

Additionally, RMST has requested that in the event this Court declines to dismiss the Strongbow action, it stay the Strongbow action pending a decision in the RMST action.

In response, Strongbow contends that the first-filed rule should be disregarded because (1) the two suits were filed close in time, (2) the first filing was an anticipatory filing, (3) RMST should not be rewarded with priority for lulling its adversary, and (4) RMST would not be prejudiced from proceeding in federal court. Opp'n, Doc. 30 at 9–13.

### i.  Legal Standard

Under the first-filed rule, "[w]here there are two competing lawsuits, the first suit should have priority." *Emp. Ins. of Wausau v. Fox Enter. Grp., Inc.*, 522 F.3d 271, 274–75 (2d Cir. 2008) (internal quotation marks omitted). The first-filed rule, as a general matter, "embodies considerations of judicial administration and conservation of resources by avoiding duplicative litigation and honoring the plaintiff's choice of forum." *Id.* at 275 (internal quotation marks and citation omitted). However, there are two exceptions:  (1) "where the 'balance of convenience' favors the second-filed action;" and (2) "where 'special circumstances' warrant giving priority to the second suit." *Id.* (citations omitted). "The first-filed rule is not to be applied mechanically, but the party that seeks to deviate from the rule has the burden of demonstrating that circumstances justifying an exception exist." *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 555–56 (S.D.N.Y. 2000) (citations omitted).

Moreover, "where the first-filed lawsuit is an improper anticipatory declaratory judgment action," the Second Circuit has held that a district court may dismiss the first-filed case without the balance of convenience analysis. *Fox Enter. Grp., Inc.*, 522 F.3d at 275. Generally, "[d]istrict courts in this Circuit have recognized that, in order for a declaratory judgment action

18

to be anticipatory, it must be filed in response to a direct threat of litigation that gives specific warnings as to deadlines and subsequent legal action." *Id.* at 276.

Importantly, courts in this district have held that the first-to-file doctrine only applies "where there is concurrent federal litigation, not where a federal court contends with concurrent state litigation." *Port Auth. of N.Y. & N.J. v. Kraft Power Corp.*, No. 11 Civ. 5624 (HB), 2012 WL 832562, at *1 (S.D.N.Y. Mar. 13, 2012); *see also Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 517 (S.D.N.Y. 2013) (declining to transfer plaintiff's claim to state court, pursuant to the first-to-file doctrine, when defendants had commenced litigation against plaintiff prior to the federal action); *C Fink Family Tr. ex rel. Landau v. Am. Gen. Life Ins. Co.*, No. 10 Civ. 9230 (JSR), 2011 WL 1453793, at *1 (S.D.N.Y. Apr. 7, 2011) (finding that abstention, as opposed to the first-filed rule, was more appropriate when determining whether to dismiss a federal case in favor of a concurrent state court action); *Alpine Grp., Inc. v. Johnson*, No. 01 Civ. 5532 (NRB), 2002 WL 10495, at *4 (S.D.N.Y. Jan. 3, 2002) ("It is important to note that the 'first to file' rule does not control in this matter because only one of the two actions is a federal action."); *Radioactive, J.V. v. Manson*, 153 F. Supp. 2d 462, 473 (S.D.N.Y. 2001) ("The first-to-file doctrine applies to concurrent federal litigation—not concurrent state/federal litigation.").

### ii. Application

Here, RMST seeks dismissal of the Strongbow action as duplicative of the RMST action filed in state court. Memo. in Supp., Doc. 29 at 15. It asserts that the Strongbow action was entirely retaliatory and both actions seek a declaration of ownership over the same Four Items. *Id.* Further, RMST argues that this Court should dismiss the Strongbow action because, unlike its adversary, it cannot assert counterclaims against two of the defendants without disrupting diversity in this Court. *Id.*

19

Strongbow, on the other hand, underscores that "the first-filed rule does not constitute an invariable mandate, but is only a presumption that is often overcome when circumstances favor the second-filed action."  Opp'n, Doc. 30 at 14 (citing *Emp. Ins. of Wausau*, 522 F.3d at 275).  It therefore contends that there are several factors that disfavor applying the first-filed rule here. *Id.*  Namely, the rule is disregarded when (1) competing suits are filed close in time by only a few days, (2) filed in anticipation of a notice-of-suit letter, and (3) employed as a ruse to lull its adversary from filing its case first.  *Id.* at 15–16.  Additionally, it argues that RMST would not be prejudiced from proceeding with a federal action because it "*can* bring third-party claims" under Rule 14.[21]  *Id.* at 17 (emphasis in original).

Despite the arguments made by both parties, the weight of authority in this Circuit is that the first-filed rule only applies when a court is faced with concurrent federal actions in different federal courts.  Here, both actions are in the same federal court, the Southern District of New York, and before the same judge.  Thus, the rule is inapplicable in this case.  Accordingly, RMST's motion to dismiss under the first-filed rule is denied.

### C.  RMST's Motion to Stay the Strongbow Action is Moot

Lastly, as an alternative to a dismissal, RMST requests that this Court stay the Strongbow action pending a decision in the RMST action.  However, because remand has been denied, the Court finds that the motion to stay the Strongbow action is now moot.  Instead, the Court moves to consolidate the related cases under Federal Rule of Civil Procedure 42(a) *sua sponte.  See, e.g.*, *Devlin v. Transportation Commc'ns Int'l Union*, 175 F.3d 121, 130 (2d Cir. 1999) ("The

---

[21] Rule 14 provides, "[a] defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it."  Fed. R. Civ. P. 14(a)(1).  Further, "[t]he plaintiff may assert against the third-party defendant any claim arising out of the transaction or occurrence that is the subject matter of the plaintiff's claim against the third-party plaintiff."  *Id.* 14(a)(3).

20

proper solution to the problems created by the existence of two or more cases involving the same parties and issues, simultaneously pending in the same court would be to consolidate them under Rule 42(a) of the Federal Rules of Civil Procedure.") (citation omitted).

Under Rule 42 of the Federal Rules of Civil Procedure, a district court may consolidate one civil action with another civil action pending in the same court if both actions "involve a common question of law or fact." Fed. R. Civ. P. 42(a)(2).  When actions are consolidated, they are "join[ed] together . . . without . . . los[ing] their independent character." *Hall v. Hall*, 138 S. Ct. 1118, 1124–25 (2018).  "The proper solution to the problems created by the existence of two or more cases involving the same parties and issues, simultaneously pending in the same court [is] to consolidate them under Rule 42(a)." *Miller v. USPS*, 729 F.2d 1033, 1036 (2d Cir. 1984). "A district court can consolidate related cases under [Rule 42(a)] *sua sponte.*" *Devlin*, 175 F.3d at 130.  And "[i]n assessing whether consolidation is appropriate . . . , a district court should consider both equity and judicial economy." *Id.*  But "efficiency cannot be permitted to prevail at the expense of justice—consolidation should be considered when 'savings of expense and gains of efficiency can be accomplished *without sacrifice of justice.*'"  *Id.* (citation omitted and emphasis in original).

Because these actions involve common issues of law and fact as well as the same relevant parties, both equity and judicial economy support the consolidation of these cases.  The Clerk of Court is therefore directed to consolidate these cases.

### D.  Sanctions Request

Finally, Strongbow seeks costs and fees reasonably incurred as a result of RMST's procedural tactics which it claims have caused needless expense and delay.  *See* Opp'n, Doc. 30 at 25.  Specifically, it asserts that RMST unreasonably multiplied these proceedings by pursuing

its claims against defendants Daly and Mobile Grocers despite having no factual basis to support such claims.  *Id.* at 26.

"Section 1927 looks to unreasonable and vexatious multiplications of proceedings; and it imposes an obligation on attorneys throughout the entire litigation to avoid dilatory tactics." *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1345 (2d Cir. 1991).  The purpose of this statute is "to deter unnecessary delays in litigation."  *Id.* (quoting H.R. Conf. Rep. No. 1234, 96th Cong., 2d Sess. 8, *reprinted in* 1980 U.S. Code Cong. & Admin. News 2716, 2782).  "Bad faith is the touchstone of an award under this statute."  *Id.*

The Second Circuit has held that "an award under § 1927 is proper when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay."  *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986).  In contrast with sanctions under Rule 11, awards pursuant to § 1927 "may be imposed only against attorneys . . . ."  *Id.*

The Court may impose sanctions through its inherent power, which stems from the very nature of courts and their need to be able "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31 (1962)) (internal quotation marks omitted).  However, the Supreme Court has made clear that because of the "very potency" of a court's inherent power, it should be exercised "with restraint and discretion."  *Id.* at 44. Accordingly, a clear "showing of bad faith" is required to justify the use of the court's inherent power.  *Oliveri*, 803 F.2d at 1273.

The Court emphasizes that imposing sanctions, "whether premised on § 1927 or the court's inherent authority, must be supported by a finding of bad faith." *Ke v. J R Sushi 2 Inc.*, No. 19-civ-7332 (PAE) (BCM), 2022 WL 1496576, at *8 (S.D.N.Y. Feb. 7, 2022), *report and recommendation adopted*, No. 19-civ-7332 (PAE) (BCM), 2022 WL 912231 (S.D.N.Y. Mar. 28, 2022) (citations and quotation marks omitted). "This standard is met if an attorney becomes aware of the meritless nature of his client's claims, yet continues to pursue the litigation." *Id.* (citations and quotation marks omitted).

In its motion, Strongbow argues that sanctions are warranted here for two reasons:  first, RMST was aware, or should have been aware, that it has no factual basis for asserting claims against Daly and Mobile Grocers; and second, claims the Court has previously "warned RMST that its ethical duties might be triggered if it proceeded knowing that Ms. Daly had 'divested herself.'"[22]  Opp'n, Doc. 30 at 26–27.

In response, RMST asserts that:  first, it obtained permission from this Court to file its motion; second, it has a good faith basis for asserting its claim against Daly and Mobile Grocers; and third, Strongbow's production of self-serving and inconsistent declarations cannot justify a finding that it is a victim of abusive litigation practice.  Reply, Doc. 33 at 13–14.  In regard to its assertion of good faith, RMST contends that Strongbow has refused to provide documentation regarding the sale of the Four Items despite both parties entering into a confidentiality agreement with each other on July 20, 2022.  Segal Decl., Doc. 28 ¶ 40 n.4.  Instead, it claims to have only

---

[22] The Court notes that at no point did it "warn" RMST's counsel that it would be sanctioned.  The Court simply noted that counsel was undoubtedly aware of her ethical obligations.  As the transcript states, "COURT:  I'm sure, Ms. Sapir, [RMST's counsel,] being obviously a member of the bar of this court, presumably, understands that there are ethical obligations with which attorneys have to abide."  Case No. 22-cv-5686, Conference Tr., Doc. 24-3 at 18:4–9, Aug. 12, 2022.

been provided with a redacted copy of the sale agreement that purportedly does not answer all of its questions surrounding the sale. *Id.*

To determine sanctions under § 1927, the Court "must find clear evidence not only that the claims were entirely meritless but also that the attorney knew or should have known that they lacked merit and thus acted for improper purposes in filing or pursuing them." *Ke*, 2022 WL 1496576, at \*12 (quotation marks and citation omitted). Here, no "clear evidence" has been provided that would warrant sanctions.

Indeed, Strongbow points to possible gamesmanship in the initial filing of the state suit. Yet in its motion for sanctions, Strongbow merely suggests that RMST, at the very least, "should" have been aware that its claims against Daly and Mobile Grocers were meritless when presented with the Declaration of Maureen Daly in opposition of RMST's letter motion for a pre-motion conference. Opp'n, Doc. 30 at 26–27. However, this Declaration was filed after the RMST action was initiated and removed, and after RMST filed a letter motion requesting a pre-motion conference. *See* Case No. 22-cv-05685, Daly Decl., Doc. 12. Nothing in this Declaration suggests that RMST had knowledge when it filed its Action on July 3, 2022, nor that it had knowledge when it filed its letter motion requesting a pre-motion conference on July 25, 2022. *See id.* Moreover, RMST has explained why it believed Daly still retained an interest in the Four Items. *See supra* note 14. Therefore, the conduct of RMST does not amount to the level of bad faith contemplated by Section 1927.[23] Since no evidence has been provided that would lead the Court to find that RMST's counsel was motivated to delay the proceedings, the

---

[23] Unlike Rule 11, § 1927 requires more subjective bad faith by counsel. *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1345–46 (2d Cir. 1991) ("[Section] 1927 invites attention to a course of conduct, and imposes a continuing obligation on attorneys to avoid dilatory tactics.").

Court declines to issue sanctions under § 1927.  Accordingly, Strongbow's request for costs and fees is denied.

### III.   CONCLUSION

For the reasons set forth above, RMST's motions to remand and dismiss or stay are DENIED, and Strongbow's motion for sanctions is DENIED.

The Clerk of Court is respectfully directed to:

- terminate the motion in Case No. 22-cv-5680, Doc. 27;

- terminate the motion in Case No. 22-cv-5685, Doc. 18;

- terminate defendants Mobile Grocers of America, LLC and Maureen Daly in Case No. 22-cv-5685;

- consolidate Case No. 22-cv-5680 and Case No. 22-cv-5685;

- correct the spelling of "Titantic" to "Titanic" in Case No. 22-cv-5680; and

- correct the spelling of "Daley" to "Daly" in Case No. 22-cv-5685.

The parties are directed to appear for a telephonic status conference at 11 a.m. on Tuesday, August 15, 2023.  The parties are directed to dial (877) 411-9748 and enter access code 3029857# when prompted.

It is SO ORDERED.

Dated:   August 1, 2023
        New York, New York

_____
        Edgardo Ramos, U.S.D.J.